Good morning, Your Honors. Let me see my address there, please, the Court. I am Representative Alcox, the petitioner on this case. In this case, the merits of the petition were not decided. The Court dismissed the case finding that Mr. Alcox had not exercised due diligence in the presenting of the claims of his petition. And so deciding, the District Court failed to say what that due diligence would have been. And I'm just wondering, what could Mr. Alcox have done more than he had done? You have to look at this case as to exactly what it was. The key to this case was your glossary. You have to exhaust state remedies before you can go to federal court. In the state petition, you have to file all of the claims, both state and federal. For example, the first claim, Mr. Alcox knew he was innocent. And he had told, he had repeatedly told people, including his lawyer, that he was innocent. And no one seemed to hear him. He could not file a petition in federal court, simply on his declaration that he was innocent. He had to get evidence backing that up. Now, the key to this case was Rick Lothary. He couldn't contact Rick Lothary on his own. What he needed to do was find somebody on the outside who could help him, who could help him get the evidence he needed to present the... When you say the key to this case is Rick Lothary, the problem I have with Rick Lothary is that there was a hearing in the state court during which the state judge made findings of fact adverse to Mr. Lothary's credibility. And so his credibility was determined to be zero in the state court. And as you probably well know, we're bound by that. And so, Mr. Lothary, why isn't he just worth nothing in the federal habeas context? And I was kind of surprised that I didn't find that out when I read your brief. I'm sorry that it wasn't laid out in the brief as clearly as I thought it was. It wasn't laid out at all. You see, your case, you make a really good case in your blue brief, but it begins to fall apart when I find out that Lothary's already been tested and found by a judge in state court to be not credible. Your Honor, it's not... Well, first of all, that was the only court that heard the evidence on this case, and that court ended up granting the writ on IAC. And the IAC, the facts underlying the IAC was found because of Rick Lothary, not his testimony. But what happened was Rick Lothary allowed, when I contacted Mr. Lothary and met with him, he allowed, he gave his attorney permission for me to go through Mr. Voicy's, the public defender's file, the public defender who represented Rick Lothary at trial. And in that file is where I started to find all of the materials which led up to, one after the other, it's not Mr. Lothary's testimony that was crucial. It was what Mr. Lothary allowed us to do by waiving attorney-client privilege, allowing us to find all of the other evidence that should have been presented at Mr. Alcox's trial by his trial attorney. Now, he couldn't contact Rick Lothary himself to get that kind of permission. First of all, the last time he had seen Mr. Lothary was when they were in the designation center of CDC and Rick Lothary tried to kill him. Second of all, a prisoner in CDC is not allowed to contact another prisoner. He had to find somebody on the outside, and he did. It took him, he was adopted. He had, that family was unable to help him. They had no resources. He decided to try to find members of his biological family. He found the tissues. The tissues in turn found me. Even after finding me, who I was on the outside and could do this writing, it took almost two years to get Rick Lothary to sign, or actually three years for him to sign the petition, because I was concerned about timeliness. I knew we had to do, we had to file in state court so we could get into the federal court, and after a while when Rick Lothary made it clear he would not sign a declaration, even though he had given us all of this information, even though he had waived attorney client privilege for me to look into the file, I went ahead and filed. The state court addressed timeliness on two occasions. The first was when I filed that first petition without Mr. Lothary's signature, and the state court told me, on timeliness, I had jumped the gun. I had come there too soon, that I should not have come there until I got his signature, and he denied it without prejudice. We then eventually got, well, Mr. Lothary did not want to sign anything that I typed up. He wanted to do his own. He did that. Ms. Tissue went to visit him, and he on his own, and after meeting with Ms. Tissue and her persuading him that it was the moral right thing to do to come out and say that, who he was actually there with, he did that on his own, and then we went back to court, and the court issued the order to show cause, and we had the evidentiary hearing, and this is interesting. The court who granted the issue to show cause, the judge who issued the order to show cause, ended up retiring right before the evidentiary hearing, but he already had ordered the evidentiary hearing, so another judge got stuck with us having an evidentiary hearing, and he initially, he limited with us to only the one issue of actual innocence. He made it very clear on the record that we were not allowed to go into IAC during that evidentiary hearing. So you litigated actual innocence? So we litigated actual innocence. And what was the conclusion, the finding? You have to have been at that hearing, which I was, and what happened then? I'm asking you what was the finding? The finding was by Judge Garcia of no actual innocence, but he also contradicted himself in his own order, because you could tell that Judge Garcia was troubled by the evidence he heard. He also stated there was substantial evidence showing reasonable doubt, and that's why what happened, that after not allowing us to present evidence in IAC, Judge Garcia, after we filed our post-hearing briefing, Judge Garcia contacted us and said, please give me briefing on ineffective assistance of counsel. Well, my first statement in my brief, of course, was we were not allowed to present evidence of any of this as contested. Please reopen the evidentiary hearing. In other words, no one ever asked, the state did not ask for it to be reopened. And we did that. How was Mr. Lothary dealt with in this hearing that you're telling us about, as a result of which there was a finding of no showing of actual innocence? I'm sorry, what do you mean? How was Mr. Lothary? What happened to Mr. Lothary in that hearing? What happened, that was also interesting, what happened to Mr. Lothary at that hearing. You mean when he came to testify? Yes. When he came to testify, this is all in the transcripts. When he came to testify, what happened initially was that Judge Garcia warned him that testifying was probably not in his best interests, and Judge Garcia insisted on finding a lawyer to represent him at that hearing to make sure that he really wanted to testify. Is there any problem with that? No. It took a whole morning, and Mr. Lothary was adamant that he wanted to testify, and he ended up testifying at the hearing. Right. And as a result of his testimony, what findings did the judge enter regarding his credibility? He found that he was not credible. However, like I said, the judge also had the judge heard the other evidence, and it's interesting. All of that other evidence actually bolstered Mr. Lothary's testimony. You're aware of the cases that say if there's findings like this on credibility that we're bound by those in this context. Are you aware of those? I am. And if you are, then how do we get around that? Starting from the propositions you told us that Lothary's the key to the whole case, we've got a finding of no showing of actual innocence, and one of the reasons is because Lothary's not a credible person. Because Lothary was the key to the case not because of his testimony at the hearing, but because his waiving attorney-client privilege allowed us to find and establish his I.I.C. But all the stuff that you found, though, was from Lothary, and he's been found not to be credible. Everything that Lothary has said is found not to be credible. Not from what he said, Your Honor, but from allowing me to go into the files and finding the investigation that his attorney did with his investigator, finding, in fact, that Mr. Beley, who represented Mr. Alcox, did not have all of the police reports, finding, in fact, that Mr. Boise had the jailhouse recordings. Mr. Beley didn't have them. So what you're saying is that even though this trial court found Mr. Lothary not credible, his testimony or what you learned from him led to other evidence that we should be considering as well. Exactly, exactly. So it's not Mr. Lothary that's key. It's all the other stuff that you found. To be more accurate, what I should have said, and I apologize, it's not Mr. Lothary, but allowing Mr. Boise to let me go through his files, to find the blandest reports. Uncovered all kinds of other information. Exactly. And that's the stuff that you're talking about. And that was key. And what about the alibi? You say there's something defective about it. As to the alibi, I mean, the first time, what happened with the alibi is that Mr. Beley told Mr. Alcox that the DA would impeach these witnesses. We've got this curious colloquy that happens in the trial court that we, again, don't find out about in your brief, where counsel and your client stood up and waved alibi. That's correct, because my client was falsely. Did you not think that was significant? And what are we to do with that? That was briefed in the state court when we got the reversal. That was crucial. That was absolutely crucial. But I do address that in that what I do say in the brief here in the federal court is that Mr. Alcox was misled by his attorney. He had been drinking heavily at that time. His attorney or Mr. Alcox or both? Both. Actually, this is outside the record, but actually both. I mean, Mr. Beley afterwards, but Mr. Alcox when he was out during this period of time that all of this stuff happened. Back to the alibi. Back to the alibi. All right, so Mr. Alcox, he was drinking heavily, but he thought I was really at that party. That's what he started telling the officers in this, quote, confession. And then he began questioning himself. Maybe I wasn't at that party. I know I wasn't at the murder, but I thought I was at the party. And when he had his adoptive father go out and talk to these witnesses and ask them to call and to cooperate with his defense attorney, but his defense attorney told him that they were not available, that they would not make good witnesses. So he assumed that maybe he was wrong and that these people were not backing him up. In fact, this Du Bois's investigator interviewed all of these people and they all confirmed that he was with them that night. When I found them years later, and they were difficult to find because they were people from Vandenberg Air Force Base, and when they were finished with the Air Force, they were scattered throughout the country. My investigator found one in Tennessee. This took quite a bit. I found these people after the writ was granted while we were preparing for the second trial. One was in Tennessee, one was in Missouri, one was in Florida, and they all said the same thing. Two of them told me, told us, that they had in fact called Mr. Dealey and his phone calls would never return. Mr. Dealey told Mr. Alcox he had no alibi. He had no alibi witnesses. Mr. Alcox did not know any different. He didn't know any different until I was allowed to see Mr. Du Bois's file and I talked to Ms. Balanus, who is Mr. Du Bois's investigator. She told me how she was always upset about this condition because she knew that Mr. Alcox was innocent. We have something called Mr. Alcox's confession. Okay. Was that ever attacked as involuntary or inadmissible in the trial court? It was, and I'm not raising it now. I'm not, but yes. So you're accepting the fact that the confession stands as lawful and constitutional? That was the finding and you're not attacking that? No. I'm not arguing that at this stage. So we have a case with a confession from your client? Is that what you're conceding? If you listen to that confession, that so-called confession, what I'm saying it was not a reliable confession. What I'm saying is that it was. Which is it? I mean, it was litigated and it was found to be admissible. It wasn't involuntary and it was not taken in violation of Miranda or anything else, and that stands. Your Honor, there's a difference. That stands, notwithstanding that you're saying, well, but still, it's not reliable. Right. I don't know how you can have that cake and eat it, too. Because that, there are two different issues, and one is voluntariness and Miranda, and second is even if a confession is voluntary, it can be unreliable. The literature is filled with cases of unreliable confessions where they were admitted as being voluntary and not violating the Fifth Amendment. Sue, can I just, okay, what you've raised here are ineffective assistance of counsel claims, right? Right. Okay, and the court said that you're barred from raising them because the statutory time for raising them under AEDPA was told. Did you have a hearing on due diligence? No. I was going to get to the second time. It's the only other time that this issue was fully briefed. The court, again, the court found timeliness. When we were in the Second District Court of Appeal. Well, I'm going to ask you about the Federal District Court decision here. Did you have an evidentiary hearing on due diligence? No. Okay. Did you ask for one? Yes. Well, I asked for an evidentiary hearing when I filed all of my briefing. Yes, I did. Because I think some of the questions, some of what we've been talking about is whether or not you're, if you could assert your IAC claims, whether you'd be able to demonstrate prejudice. I don't think that there's any doubt that we could demonstrate prejudice. I mean, I keep going back to Judge Garcia, the one court who heard the evidence, and he clearly found prejudice when he said that the evidence he heard was substantial evidence that could raise reasonable doubt. That was total dicta and just an off-the-cuff remark. It's not a finding or a conclusion of law. That's correct. But I think that dicta is significant. But what's in front of us is the propriety of the district court dismissing your claims because it was untimely under AEDPA. Right. Okay? So what concerns me is whether or not the court correctly dismissed your case and the question of whether or not you could have found the factual predicate for your claims in the exercise of due diligence. What I hear you arguing is that you exercised due diligence, but we don't have any findings on that. Correct. Evidentiary findings. And significantly, in the decision finding that he did not exercise due diligence, the district court repeated over and over and over again how he was represented by counsel at each stage in the federal proceedings, and that's true. But getting that counsel and how difficult it was to get that counsel, that's where the due diligence comes in. It took him a long time to get counsel, and without counsel, he could not have presented his IAC claims. What I'm also looking at is whether there's any real showing of actual innocence that might excuse a lack of diligence. I think the record is filled with that. We have. We have. Okay. We'll take out Rick Lothry. All right? We'll take out Rick Lothry. Take out Rick Lothry, add the confession. Carolina Gonzalez, I don't know what she's up to. She won't participate. She wrote out a declaration for the federal – her declaration was submitted with the federal petition. And then what? And it hasn't been dealt with because the – even if she did recant, which I don't read necessarily what she said as being recanting, rather like I don't know, but even omitting her evidence, she was just additional evidence that he was at the motel. It isn't evidence that he was innocent. So I didn't see what the – how that evidence went to actual innocence at all. Maybe you can explain. Well, the fact – the point with Carolina Gonzalez is whether or not she even saw Joel Alcox that night. She claims that her can make the statement. So – but the statement was, I was at the motel, they have my fingerprints but they won't catch me, or words to that effect. And so if you remove that evidence from the trial, that doesn't go to showing that Mr. Alcox was innocent. That just removes that additional evidence of his presence at the motel, which I believe was consistent with his trial strategy anyway that he was at the motel. So that didn't seem to help your actual innocence claim. Or maybe you can tell me why that's not correct. You have to look at the overall picture. On Carolina Gonzalez, when we did the evidentiary hearing, this case had so many strange twists and turns. To put everything out there, one of the strange twists and turns, and this is in the record, was at the time of the evidentiary hearing, we ended up finding Carolina Gonzalez in Washington State. And she was telling us that she was using drugs at the time and she doesn't know why she made that statement. We wanted her to testify. Because at that point, I had been appointed, the judge would have had to pay for her expenses to come to testify at the evidentiary hearing. So it was agreed, the prosecutor and I agreed, that what we could do instead was bring in her out-of-court statements, her out-of-court statements to us and to the DA. And to the DA, what she said was that her testimony was most likely a figment of her imagination as a result of doing drugs. And the people who were with her that evening said that they didn't see. Joe Alcox wasn't there. He never made that statement. And when you get to the actual witnesses, the really important witnesses, I believe, are the fire captain, Roy Bellis, who was the first to arrive on the scene to treat the victim, along with the paramedic and the paramedic's daughter, Tracy Maniscalco, who was assisting her. And they all came. What happened was, during the evidentiary hearing, Tracy Maniscalco read something in the Santa Maria Times and called me and said, I can testify. I know what happened. That when Roy Bellis asked who did this, the victim was very clear, he said it was Sanjay. Her mother was then called to testify at the evidentiary hearing by the prosecution. Her mother repeated that, said yes, he said Sanjay. After that... Who's the mother? It's Kathy Kelly, her now married name is Gomez. Gomez? Yes. Didn't she say it just started with an S? Right, but at the evidentiary hearing, she said that it was clearly Sanjay. It went in the original police report, that's what she says, but at the hearing, she and Tracy both said, her daughter said it was Sanjay. After that, I got a phone call from Roy Bellis, the fire captain, who confirmed that, who then provided us a declaration, and it was too late to present it for the evidentiary hearing, so that's been presented in the federal court. At first he said it was Sargenal. That's what it says in the police report. And now he thinks it's Sanjay. Correct. Correct. Okay. Are there any other questions? I would like to have some time for rebuttal, if I could. Okay. Well, you're well over. Let's just see if there's something you need to rebut. Thank you. Good morning, Your Honors. Deputy Attorney General Jason Tran, on behalf of Respondents. I just want to briefly address a couple of points raised by counsel as to the issue of due diligence. After Petitioner's appeal ended, he waited more than 13 years to seek collateral relief. He sat on his rights for well over a decade and has, to this day, offered no explanation, as the district court pointed out, as to why he did nothing. And so because there have been no allegations of due diligence in that substantial timeframe, there was no basis for an evidentiary hearing. That's my real question on that point, is he does say that he didn't have the wherewithal to get help. He was trying to locate his real family. I mean, he does say a lot of things, and there wasn't a hearing on that. And so I'm not sure we really know what kind of due diligence occurred from 1989 to 1998. He might have been doing all he could do. We don't, you know, given the situation, we don't really know. Well, there has never been any allegation that he sought any kind of legal counsel. For example, he could have filed a petition in state court, a habeas petition in state court or federal court, and requested appointment of counsel. And had he done that within that 13 years, he might have gotten counsel. This isn't a capital case, right? I mean, I thought they weren't appointing counsel. I understand that, but I understand also that counsel sometimes is appointed in non-capital cases where there is a dispute on an issue such as due diligence. And so my point only is that had Petitioner raised this issue long ago, instead of sitting on his rights for 13 years, we might not be here today. You're saying, well, he failed to come forward with a showing of anything at all that would suggest any diligence whatsoever. Exactly. Was he told you've got to show us something that you did that could amount to diligence? You did everything you could. Was he told that? I'm not sure. I don't know the answer to that question. But I think speaking from just simply common sense standpoint, if he truly were innocent, as he claims he is, then he would not have sat on his rights for more than a decade. Well, you know what happened to him was his conviction was final in 89, and AEDPA wasn't enacted. It didn't even go into effect until the statute of limitations until April was 97, right? April 24, 1997. I'm sorry, 1996 is when it went into effect. When it's in effect, but the statute didn't begin running on claims? Until April 24, 1997, one year later. Right, that's what I'm saying. So he's in prison from 89 to 97, or maybe 96, and he doesn't even know that he has a statute of limitations with which he needs to comply, because it hasn't been enacted yet. I understand that, too. But, Your Honor, I still can't help but go back to simply common sense that dictates that you complain or file a petition for relief if you truly feel that you have been pretty much railroaded by the system. I agree with your common sense and your logic. It's just I wish there was some evidence. And as the district court pointed out, petitioner has offered no explanation whatsoever for that diligence, for lack of due diligence. When did he start to try to do something to relieve himself from this conviction? He filed his first behaviorist petition in 2002. Right, but before you file the petition, you have to gather evidence. You have to get attorneys. You have to contact people. You have to get help. There's other things you have to do. So when did he start doing all that? I think petitioner claimed that he started contacting, or he was contacted by relatives in, I believe, 1999, I believe. Something, maybe counsel can clarify that point. Is it true that before Edgar, he had no reason to believe that he was up against any clocks at all? I mean, you could file behaviorist petitions until your ears fell off. That's true. So is it fair to hold him to not doing anything during the time when the law didn't require him to do anything? Well. Is that appropriate? I think. It seems that Judge Wardlaw has a good point. You might be opposing upon him requirements that didn't come into play until late in the 1990s, during the period where they didn't exist. And also in state court, as we know, the state court had no deadlines for what was timely or not timely. I mean, maybe the Supreme Court will make them have deadlines soon, but they still have no rule. And also, it was strange, because in California, because you could start by filing your petition at the Supreme Court, and then go down and file it at the Superior Court. I mean, it's very crazy rules for behaviorists. Exactly. He could have filed a petition in any state court, in any one. And that is an interesting system. But he didn't have to. He didn't suffer any disability by waiting. Well, the disability was his continued incarceration. But I mean legal disability that you're not going to be ever able to raise anymore. That's true. I can see that the legal disability began on April 24th. Well, yes, April 24th, 1996. So at that point, he had noticed that he had a year, you know, theoretically, who knows what he knew. But he had theoretical legal notice that he had a year in which to file his petition. And so if we look starting at 96, you say that your understanding, and we'll perhaps get clarification, is that he, in 99, he began the process. 1999, March 1999. That's the filing. But what did he do between 96 and 99? No, I think he's – I must have misunderstood. Well, this is what the district court found. Petitioner took no meaningful action regarding his claim for more than 10 years. From December 21st, 1988, when the California Supreme Court denied his petition for review, until March 1999, when a distant relative began to search for an attorney to represent the petitioner. Well, now, that's sort of inaccurate because his conviction wasn't final until May 21, 1989. Would that – So the court's date is a little off. Yes. December 21st, 1988 is when the petition for review in the California Supreme Court was denied. And then 90 days later, that would have been March 21st, 1989. I don't know. I get May 21, but that's minor. That's a minor dispute. So here's another part that kind of troubles me. It seems that the counsel was deficient. I'm not sure if he could show prejudice in light of all of the things that certainly Judge Trot has pointed out today. But the counsel's performance does seem to fall below the level of standard of performance in a capital case. So I'm kind of troubled about whether – I'm troubled about this due diligence aspect barring his ability to even be heard on the merits of that. Maybe he loses because he confessed. And so maybe counsel – I don't know. But it does seem he failed to investigate alibi witnesses and that there was, in fact, this party going on. And there were other witnesses that had the victim's statement that the person who killed him's name began with an S. There was substantial evidence in the police reports, the investigation files at that – but by law enforcement at that time, that counsel represented Petitioner, showing that there were witnesses that would have said just the contrary, that Petitioner was not at the party that he claimed he was at. And so there was a lot of evidence against Petitioner, not to mention the confession. And I think as the State Appellate Court found in their published disposition, counsel felt boxed in. He had bad facts before him, and he dealt with the situation the best he could. And the strategy that he and Petitioner agreed upon as expressed in open court was that they would relinquish an alibi defense and simply present the defense theory that Petitioner abandoned the conspiracy to commit the robbery that night. And I think that was a reasonable decision based on all the evidence that incriminated Petitioner. And with that, I just want to conclude that as to the issue of actual innocence, in his confession, he was – in his police interview, Petitioner was asked, was the idea to rob, to commit the robbery, was that conceived by you or Mr. Lothery? And his response was, quote, it was really both of ours. It was to rob it. I just wanted to sneak back there and get some money, end quote. And that's on page 71 of his police interview. So I think that pretty much speaks warnings as to the actual innocence. What was he actually convicted of? He was convicted of first-degree murder, first-degree robbery, or robbery and first-degree burglary. Was he convicted on a felony murder theory? I believe so, yes. Yes. Murder in the commission of a robbery, yes. Counsel shaking her head no. Maybe I – my memory might be faulty on that, but I believe that. Because the reason I ask that is, you know, if it was – I mean, his saying that he wanted to go rob, if he wasn't convicted of felony murder, that doesn't prove that he intended to murder, right? Right. Yeah. I think the crime that really led to all the other convictions was the robbery, yes. Okay. All right. Unless this court has any further questions, I will submit. Well, you – I don't know if you argued this, but Lee v. Lamport forecloses the equitable tolling. Did you raise that with us? Yes, in a letter, a 2018 letter. Are you aware that the mandate hasn't issued on that case? Yes, I am aware of that case. If and when it becomes final. Yes, but I did propose that that case is persuasive for this proceeding, and I think the reasoning in that case is sound and I think supports the Respondent's position. Okay. Thank you. All right. I promise this will be brief. To start out with, Respondent suggests that he could have filed a petition and asked for appointment of counsel. I can tell you from personal experience it doesn't happen. My husband is always on the outside. Why do I have all these cases? It's because you cannot get appointed in the California courts on habeas unless it's a capital case. End of story. I can tell you that from my own experience. Was there any showing of anything that looks and sounds like either diligence or I was unable to exercise any because of X, Y, or Z? What there is is his saying that he was looking for people on the outside to help him get what he needed to do to present his claims. During what period? During that 10-year period. It took him a long time. I don't know if you know what DSS records say, Eli. I mean, he finally had somebody in the prison who helped him. As to the dates, the date that he first met the alcohol, I'm sorry, the tissues was 1999, and I was brought in on the case in the year 2000. It still took me some time to gather what I needed to file a proper petition. And common sense tells us, let's use common sense. He couldn't have gone in on what he had, his own word that he was innocent. What would have happened to that petition? It would have been deep-fixed in a minute. Carolina Gonzalez's deposition was not considered because she refused to testify. Isn't that right? No. At that point, what had happened, that's another interest. This is in the record of the evidentiary hearing. She refused to come to Santa Maria to testify. What happened then was during the evidentiary hearing, there was an article in the Santa Maria Times that an aunt of hers sent her, and she felt guilty. She called me at the hotel and said, I will come and I need the expenses. At that point, when we went back into the evidentiary hearing and explained this to the judge, the judge was a little queasy about spending more county money because at that point I was appointed. I was appointed for the, you know, at the point that an evidentiary hearing was going to be heard. That's when you get appointed, not at the filing of the petition and not for the briefing. And that's true in the federal district court. So the judge denied your request to continue to get her to testify? No. He suggested strongly that we could come to some resolution of this without having to bring her there, and the DA agreed that what we could do is admit into evidence all of the statements that she had given, both us and the district attorney. And they all came in as evidence. The declaration came in too? The declaration that she filled out? Yes. No, because she didn't fill out the declaration until after. What happened was that, and this is in the brief, is that when she learned that the reversal was reversed by the second district, based largely on her testimony, she was so upset that anybody would rely on her testimony, at that point she wrote the declaration for me and sent it to me. Okay? And the respondent is simply wrong in saying that there is evidence that, in fact, Mr. Alcox was not at that party. There's a statement by the DA that all of the, actually by defense counsel, that he had been told by the DA that all the witnesses could be impeached. We asked for that evidence. None of that evidence has ever been produced. I haven't seen it. It doesn't exist. There is no evidence to show that he was not at that party. No police reports saying we talked to witnesses ABC and they say he wasn't there. No. In fact, it's the contrary. When you look at Ms. Boise, Ms. Balansis, the public disaster investigator, I'm sorry, I'm getting all excited, she interviewed these people and they all said he was there. And they expected to testify, and two of them told me when we were getting ready for trial, when we finally found them in Mississippi, not Mississippi, but Missouri and Tennessee. I called the defense attorney. He never called me back. And the DA ---- Where is Mr. Boise today? Pardon me? Where is Mr. Boise today? He's now the public defender in San ---- he's the head of the Santa Maria branch of the public defender's office of Santa Barbara. He's still there. And thank goodness for us that he's still there and he worked with us. Now, he brings up the confession. You have to go through the entire confession. When you go through the entire confession, you have hours of Mr. Alcock saying, I don't know, I wasn't there, I wasn't there, I wasn't there. And then you have the police officers giving him all of the information, including the fact, where did Mr. Lothery get the gun? I don't know. How would I know? Well, was it Mr. Lothery's father a police officer? Yeah, I guess so. Well, wouldn't his father have a gun? Couldn't he have gotten, taken it from his father? I don't know. Finally, the officer goes, well, what did the gun look like? He goes, I don't know. The officer takes his gun, which of course would be the same as the fellow police officer, and puts it on the table. They drew pictures of the motel, diagrams of the motel for Mr. Alcock. Finally, in the half hour, Mr. Alcock regurgitates to them, because it's the only way he thinks he's ever going to get out of that room, what they told him. We have stated that over and over and over at the evidentiary hearing, in our briefing in the state court. The DA never once contested that. Never once. And as for Lee versus Lowe, of course, just a brief statement, we would ask this court to agree with the Sixth Circuit that there is an actual innocence exception and for equitable tolling. Thank you. All right. Thank you, counsel. Alcocks versus Hartley is submitted, and we'll take Alcock versus Harrison.
judges: Trott, Wardlaw, Ikuta